ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

ROLAND CHANG (CABN 271511)
Assistant United States Attorney

450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-7108
Fax: (415) 436-7027
Roland.Chang@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>NOAH TAKODA SULEYMAN<br><br>Defendant. | CASE NO. 24-CR-00476 CRB<br><br>**MEMORANDUM IN SUPPORT OF UNITED STATES' MOTION FOR DETENTION** |

## I. INTRODUCTION

Defendant Noah Takoda Suleyman ("Suleyman") is a twenty-seven-year-old adult male and resident of South Carolina, charged with one count of coercion and enticement of a minor, in violation of 18 U.S.C. § 2422(b). The Minor Victim ("MV") is a sixteen-year-old minor girl who currently resides in Santa Rosa, California with her parents. MV has a significant history of mental health issues and suicidal ideations. Despite learning MV's age several months into messaging with her, Suleyman did not stop persuading, inducing, coercing, and enticing her with sexually explicit messages, many of which were extremely graphic in nature. Then, in mid-March 2024, he drove over 300 miles from his residence in South Carolina to have sexual intercourse with MV several times, while she was visiting

family in North Carolina. His actions did not end there. Shortly before late May 2024, he drove across the country to Northern California and removed MV from her home without her parents' knowledge or consent. This triggered law enforcement investigations in multiple jurisdictions that recovered MV unharmed. The government's investigation has revealed that Suleyman targeted MV, a young and vulnerable minor, with sexually explicit messages over the span of months, and that he acted upon those messages. In addition, that Suleyman repeatedly and consistently obstructed law enforcement investigative efforts and attempted to conceal his actions, which he knew were illegal. Finally, that Suleyman has continued in his obstructive efforts and attempted to contact MV and her family, even after his arrest. These facts show that Suleyman presents a serious danger to MV and the community and is a risk of flight. Accordingly, the Court should that the defendant be detained pending trial.

## II. FACTUAL BACKGROUND

### A. Suleyman Removed MV From Northern California to South Carolina Unbeknownst to Her Parents

On May 27, 2024, at approximately 3:17 p.m., MV's mother reported to the Santa Rosa Police Department ("SRPD") that MV had run away from home. MV's mother stated that MV did not have a history of running away, but had a history of mental illness, including anxiety and depression. MV's mental illness had resulted in prior suicide attempts and three involuntary psychiatric holds. MV's mother also located a handwritten note addressed to MV's parents and MV's minor brother. The note detailed MV's desire to run away and that if MV had stayed in the home, MV would not be alive. The note further stated that MV found an organization three hours away that could help her.

Multiple law enforcement agencies, including SRPD and the Federal Bureau of Investigation ("FBI"), initiated and obtained exigent legal process. Through their investigation, they concluded that MV was traveling by car away from Santa Rosa, Suleyman's vehicle had made a trip to California from South Carolina, and that Suleyman had been messaging MV for months regarding MV's suicidal ideations, mental health issues, and with sexually explicit messages. For example, Suleyman had told MV that she should commit suicide in his home rather than at her parents' residence. On or around March 21, 2024, Suleyman wrote to MV: ***"Whether you die by my side or 1000 miles away But I would***

***rather you die with me than die alone."***[1] On or around April 21, 2024, MV asked Suleyman, "what if i go there just to die." The defendant responded, "Id rather you die in my arms and in my care than in some cold cage."

On May 29, 2024, the FBI determined that Suleyman had returned to South Carolina and contacted him. During his interview, Suleyman repeatedly lied to FBI about not knowing MV's whereabouts, believing her age to be 24, and his own whereabouts the prior weekend. Law enforcement then obtained state warrants for Suleyman's residence and vehicle. On May 30, they interviewed him again. Suleyman made multiple false statements, but eventually admitted that MV was at his mother's residence in South Carolina. Based on that information, law enforcement successfully recovered MV unharmed from a bedroom closet at the residence of Suleyman's mother. Suleyman was charged with state misdemeanor charges for Contributing to the Delinquency of a Minor and Obstruction of Justice.[2] On August 21, 2024, a grand jury in the Northern District of California returned a one-count indictment charging Suleyman with coercion and enticement of a minor, in violation of 18 U.S.C. § 2422(b).

### B. Suleyman Targeted MV, a Minor Child with a History of Mental Illness and Suicidal Ideations, With Sexually Explicit Messages

Suleyman first contacted MV on or around November 14, 2023, via the social platform Discord, in a chat room concerning mental health issues. At the time, Suleyman was 26 years old, and MV was 15 years old. Initial messages appear to establish that Suleyman believed that MV was a 24-year-old college student. Early on, MV disclosed to Suleyman that she had a significant history of mental illness, struggled with suicidal tendencies, and that she was considering residential treatment for her mental health issues. Between mid-November 2023 and early March 2024, Suleyman and MV exchanged tens of thousands of messages regarding various topics, including MV's mental health issues, depression, and

---

[1] Suleyman communicated with MV on social media platforms. This memorandum includes selected excerpts from these communications, some of which are emphasized herein. Because Internet communication is often informal, involving typographical errors, symbols, shorthand, and abbreviations, we do not use "[sic]" to indicate all the grammatical or spelling errors or mistakes in these messages.

[2] These state charges remain pending. On August 30, 2024, the Honorable William McMaster of the Greenville County General Sessions Court ordered a $100,000 bond for Suleyman on his state charges. Because there was a pending federal indictment and arrest warrant, Suleyman was transported to federal law enforcement custody shortly thereafter.

suicidal ideations. MV repeatedly told Suleyman that she wanted to and had tried to kill herself. During these conversations, Suleyman repeatedly initiated discussions regarding sexual activities, including various forms of intercourse and sexual acts. There is a significant volume and frequency of sex-related messages by Suleyman, which are extremely explicit. Per Suleyman's request, MV also sent sexually suggestive and nude photographs of herself. Suleyman sent several photographs of his penis to MV.

### C. Suleyman Learned That MV Was a Minor Under 18 Years Old, Traveled to North Carolina to Have Sexual Intercourse With Her Several Times, and Continued to Send Sexually Explicit Messages

No later than on or around late February 2024, Suleyman learned that MV was a minor who was under the age of 18. Messages exchanged between the defendant and MV, as well as additional information obtained during the government's investigation, establish that fact. For example, on May 31, 2024, in a jail call between Suleyman and his mother and brother, the defendant admitted that he learned that MV was 16 years old "probably a month or two ago." In response, Suleyman's mother stated: "Oh well that's not good at all." Suleyman asked, "why?" His brother responded, "Because they're 16. That's a hell of a year age difference [] and they're a minor." MV also corroborated this fact in her interview with the FBI, stating that Suleyman eventually learned that she was 16 years old and a minor.

Knowledge of MV's age and minor status did not deter Suleyman from persuading, coercing, inducing, and enticing MV to engage in sexual activity. Indeed, when asked by MV whether he needed more time to process her minor age, he wrote: "no, no space needed . . . I woke up, touched myself to you, thought abt u, went to sleep again, woke up and was ready to do it again . . . ." On March 6, 2024, Suleyman wrote to MV that "The only thing that would stop me [from visiting you] is jail." Instead, Suleyman continued to message MV with sexually explicit messages and then made plans to meet up and have sexual intercourse with her. In mid-March, Suleyman drove over 300 miles from his residence in South Carolina and had sexual intercourse with MV multiple times while she was visiting extended family in Wilmington, North Carolina for her high school spring break. The distance between Suleyman's residence and Wilmington is approximately 300 miles and nearly five hours by car.

Suleyman's sexually charged messages to MV continued. For example, on or around April 4,

2024, Suleyman wrote to MV, "Im gonna fuck ur pussy and grab you around the tummy." Later in the same conversation, he wrote: "I wanna fuck and kiss and touch and pray to and bite and love and paint (on and of) and brag about and feast ravenous eyes on your whole body." He also stated: "In a completely eugenics sort of way you also have really good genes and i want to breed you like a dog." And that he wanted to "fuck[] you everyday like a damn sofa bag." MV responded that "we[]ve had sex like 7. times and not once was it in a normal spot." On or about April 9, 2024, Suleyman wrote another series of sexually explicit messages to MV. For instance, he stated: "I just want to smell our pussy and lick it and mount you and press you into the ground." Suleyman further stated that he was "gonna fuck u into a tight little ball" "Compacted into a corner." He continued, "You like being fucked like an animal . . . I need to feel you clenched on me [and] Like you need it to feed you" and "Pounding your sweet little pussy babe."

Shortly before Memorial Day 2024, Suleyman drove across the country to remove MV from her family's residence and transport her to South Carolina, motivated significantly by the intent to have additional sexual intercourse with MV, who remained a 16-year-old minor girl. In a message to MV on or around May 13, 2024, Suleyman described the new house that he had rented for them: "Im literally opening up our fuckbox tomorrow [] . . . [] . . . I mean house I mean duplex lol."

### D. Suleyman Repeatedly Attempted to Conceal His Actions From Law Enforcement and Actively Obstructed the Government's Investigation

On or around June 4, in a jail call with his mother shortly after his arrest, Suleyman stated: ***"So you know we deleted Discord that we were talking over but um I did screen cap it and I have it saved somewhere safe so haha fuck you whoever's listening to our conversation right now."*** Suleyman successfully deleted content associated with his original Discord account before he drove across the country in May 2024 to remove MV from her parents' residence.[3] However, the government obtained content from MV's Discord account, including her messages with Suleyman, through legal process. The government summarizes other examples of Suleyman's obstructive conduct herein.

**False Statements to Law Enforcement.** As noted above, during a May 29, 2024 interview with

[3] Suleyman also created a new Discord account, which he used to communicate with MV.

the FBI, while MV's whereabouts were still unknown, Suleyman lied and initially stated he did not know MV. After being shown MV's photograph, he admitted that he recognized her and then proceeded to make several false statements, including that: (i) he believed MV was 24 years old; (ii) he did not know MV's whereabouts; (iii) his last Tumblr communication with MV was on May 16, 2024; (iv) he had spent the prior weekend in Wilmington, NC, up until the morning of May 29, 2024; and (v) he had not traveled to California or anywhere other than Wilmington the prior weekend.

The next day, on May 30, law enforcement executed a warrant on Suleyman's residence and reapproached him for another interview. He lied again. Suleyman continued to deny being in Arizona, California, or Oklahoma around the time of MV's disappearance. When asked if he transported MV from California to South Carolina, Suleyman denied doing so. Suleyman did ask law enforcement "is this a murder investigation?" but did not clarify why he asked this. Suleyman further stated that he met MV through online internet platforms such as "Tumblr" or "Discord," but could not remember exactly which platform it was. Eventually, Suleyman admitted he had picked up MV and brought her to South Carolina, and that she was at his mother's residence.

**Avoiding Electronic Device Tracking.** Suleyman turned off his primary cellphone and obtained a burner cellphone for his May 2024 trip from South Carolina to California and back. MV also turned off her cellphone so that she could not be tracked. During her interview with the FBI, MV confirmed that they both turned off their phones to avoid electronic tracking.

**Physical Alteration of License Plate.** Suleyman attempted to physically alter his North Carolina license plate by using a highlighter, likely to avoid detention by license plate readers on his journey to and from California. As he stated to MV on or about May 27, 2024, shortly before picking her up: "I should be in position at 1:10, have to pull over [to] draw license plate."

MV also stated during her FBI interview that Suleyman purchased a special kind of light so that his license plate could not be tracked. This is consistent with the Discord messages. On or about May 27, 2024, MV asked Suleyman, "thought u had license thingys." He responded, "Oh true Bue it would be nice if the [police] had no leads As far as car type etc." Shortly thereafter, Suleyman messaged MV that he "would prefer if both my car and my person were 100 no camera and I think that is possible it

will just require back snd forth communication and some planning", to which MV responded, "[it's] not possible."

**Burning Physical Maps.** During FBI's search of Suleyman's vehicle, they identified hardcopy printouts of map directions to and from Santa Rosa, California that had been physically burned.

**Avoiding Toll Cameras.** During his May 2024 trip to California from South Carolina, Suleyman purposely took indirect routes to minimize or avoid traffic cameras. On or around May 27, 2024, Suleyman wrote to MV that his "eta was 12 but I was offered a route the goes around SF 30m slower and I think I'ma take it bc no tolls . . . Aka no camera of me."

**Google Chrome Search History.** On May 24, 2024, Suleyman searched "how long Discord keeps your information." On May 10, 2024, Suleyman accessed several websites on how VPN hides and prevents tracking of electronic activities.

**Discord Messages.** On or around March 25, 2024, Suleyman wrote to MV: "[t]here is risk involved no matter how prepared or dexterously i perform. I was kept up for months, *months*, just trying to come to terms with the myriad of very horrible consequence chains that I would be subject to if i didnt make it 100% clean." On or around May 21, 2024, Suleyman suggested that MV write in her goodbye note that she was going to an organization in California instead of Nevada. When MV asked, "why?" Suleyman responded: ***"Because if it is interstate . . . And they feel like its a crime it could go to the fbi."***

### E. After His State Arrest, Suleyman Attempted to Contact MV and Her Family, and Contacted the South Carolina Judge Presiding Over His Bond Hearing

Even after his arrest in South Carolina, Suleyman attempted to contact MV and her family. First, in multiple jail calls, he asked his mother to contact MV. For example, on May 31, 2024, he told his mother that he wanted to check on MV, but that it should not be through a direct message, but instead something vague to post online. Similarly, on June 2, 2024, Suleyman asked his mother to log onto one of his laptops and post a message that MV could review. On June 4, 2024, Suleyman asked his mother to search something on Google related to MV and she told him that nothing came up.

Second, on June 1, 2024, Suleyman wrote a five-page handwritten letter addressed to MV's

family in which he explained his actions. In the letter, he acknowledged that he "was never illusioned to the pain [his actions] would cause," but that he "always wished for a different way." Suleyman further admitted that he "spent 3 days screaming and crying" after he "learned the truth" regarding MV's minor status and age. However, he insisted that his actions were pure because he was "already in love" and his "devotion to [MV and MV's well-being] is greater than any other [he has] known in [his] life." "For [MV], [he] would give anything, and give it without expectation, not of reciprocation or 'reward.'" Later in the letter, he stated that he "knew full well the potential consequences [of his actions]. [He] knew it could tear apart the [MV] family." Suleyman also admitted that he "knew that if we were caught, there would be grave consequences."

Finally, on June 21, 2024, Suleyman wrote an eight-page handwritten letter addressed to the Honorable Perry H. Gravely, a judge of the 13th Judicial Circuit Court in South Carolina. Judge Gravely was going to preside over the defendant's initial bond hearing in state court, but recused himself after he received the letter. In the letter, Suleyman admitted to knowledge of MV's minor age and status, but again stated that his actions were all motivated by his intent to protect MV and save her life. He expressed no remorse for his actions, because he "know[s] in [his] heart that [he] was just trying to do the right thing." Suleyman acknowledged that he "know[s] what [he] did was illegal," but stated that his "only hope right now is to resume [his] life, work hard, and build the ability to provide for [MV], when 600 days passes and we can finally reunite."

## III. LEGAL STANDARD

Under the Bail Reform Act of 1984, the Court must detain a defendant before trial without bail where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). Detention is appropriate where a defendant is either a danger to the community or a flight risk—the government need not prove that both factors are present. *United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985). A finding that a defendant is a danger to the community must be supported by clear and convincing evidence. *Id.* However, a finding that a defendant is a flight risk need only be supported by a preponderance of the evidence. *Id.*

The Bail Reform Act mandates a rebuttable presumption of detention if there is probable cause to believe that the defendant has committed "an offense involving a minor victim under section [] 2422 [Coercion and enticement] . . . ." 18 U.S.C. § 3142(e)(3)(E). "If a defendant proffers evidence to rebut the presumption of dangerousness, the court considers four factors in determining whether the pretrial detention standard is met." *United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008). Those factors are: (i) the nature and circumstances of the offense charged; (ii) the weight of the evidence against the defendant; (iii) the history and characteristics of the defendant, including the defendant's character, physical and mental condition, family and community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings, as well as whether the crime was committed while the defendant was on probation or parole; and (iv) the nature and seriousness of the danger to any person or to the community that would be posed by the defendant's release. *See* 18 U.S.C. § 3142(g); *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986). However, "[t]he presumption is not erased when a defendant proffers evidence to rebut it; rather the presumption 'remains in the case as an ***evidentiary finding militating against release***, to be weighed along with other evidence relevant to factors listed in § 3142(g).'" *Hir*, 517 F.3d at 1086 (emphasis added) (quoting *United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986))

The rules of evidence do not apply at a detention hearing. 18 U.S.C. § 3142(f)(2)(B). It is well-settled that at a detention hearing, the government may present evidence by way of an evidentiary proffer sufficient to make the court aware of the defendant's role in the offense, the weight of the evidence against the defendant, and other relevant factors. *See, e.g.*, *United States v. Salerno*, 481 U.S. 739, 743 (1987).

## IV. ARGUMENT

Suleyman cannot rebut the statutory presumption that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community." 18 U.S.C. § 3142(e)(3), (e)(3)(E); *see Hir*, 517 F.3d at 1086. Suleyman is a danger to the minor victim and the community who also poses a flight risk.

### A. Suleyman is a Danger to the Minor Victim and the Community

#### 1. Releasing Suleyman Would Endanger MV

Despite knowing that MV was a 16-year-old minor girl with a significant history of mental illness and suicidal ideations, Suleyman targeted her and continued to send her sexually explicit messages. His actions did not end with words. In mid-March 2024, he drove over 300 miles to meet up with MV and had sexual intercourse with her several times. After that, Suleyman continued to knowingly persuade, induce, and entice MV with sexually explicit messages. Then, in May 2024, he drove across the country from South Carolina to Northern California to remove MV from her parents' residence in the middle of the night without their knowledge or consent. His plan was to move her into a new house that he had rented across the country, away from her family and friends, which he called a "fuckbox." These facts plainly establish that Suleyman's words and actions have significantly endangered the mental, psychological, and physical health of MV.

If released, it is highly likely that Suleyman would contact MV or meet up with her, which would have a debilitating impact on her mental health recovery process that remains ongoing. Even direct or indirect attempts at contact would be severely problematic, given the sensitive psychological state of MV, as well as her history of mental health issues and suicidal ideations. The government understands that MV is currently in therapy three times a week, and her family is deeply concerned about any direct or indirect outreach from the defendant.

In this case, these safety and danger concerns are not abstract or remote. After his arrest on state charges, Suleyman directed his mother to contact MV through his laptop and his social media accounts. It appears that no such efforts were ever made. However, his efforts did not end there, as Suleyman also wrote two separate handwritten letters to MV's family and the South Carolina state court judge that attempted to justify his actions. None of these letters expressed remorse. Instead, the defendant professed his love for MV and stated that his "devotion" to MV is greater than another other in his life. In other words, there is every indication that the defendant will do anything he can do to contact MV if released, which would significantly endanger the well-being of MV.

//

**2. Suleyman's Obstruction Is a Danger to the Community**

Separately, the evidence proffered establishes that Suleyman obstructed the government's investigation of his criminal conduct—another basis to detain the defendant. The defendant was willing to obstruct justice before being charged, and his incentive to interfere in the government's case is even greater now. As courts have held, "obstruction of justice has been a traditional ground for pretrial detention by the courts, even prior to detention for dangerousness which was implemented by the Bail Reform Act of 1984. *See United States v. LaFontaine*, 210 F.3d 125, 134 (2d Cir. 2000).

As detailed at length above, the defendant's disregard for the law was consistent before his arrest. He successfully deleted critical evidence of his Discord messages with MV. He repeatedly lied to federal law enforcement despite knowing that they were looking for MV and her whereabouts. He turned off his primary cellphone and obtained a burner cellphone for his journey to and from California. He physically altered his license plate to avoid detection by law enforcement. He burned evidence and took routes to avoid detection by cameras. He instructed MV on the drafting of her goodbye note to evade federal law enforcement. In short, Suleyman repeatedly attempted to obstruct the government's investigation, evade law enforcement, and destroy evidence of his communications with MV.

These obstructive acts did not end with his arrest. After his arrest, he mocked law enforcement by stating that he had his Discord messages with MV "saved somewhere safe so haha fuck you whoever's listening to our conversation right now." Then he wrote a letter to MV's family asking for forgiveness but stating that his "devotion to" MV is "greater than any other" ever known in his life.

The defendant's willingness to circumvent the government's investigation demonstrates that he is not likely to be deterred from future criminal conduct by the pending charge. *United States v. Burke*, 2013 WL 5194138, at *1-2 (S.D. Fla. Sept. 17, 2013) (finding that where a defendant engaged in "methodical and repetitive efforts to defraud and evade detection," this "pattern of deception suggests that [she] would continue to pose a danger of further harm to the community if released").

**B. Releasing Suleyman Would Fail to Reasonably Assure His Appearance**

The factors set forth in 18 U.S.C. § 3142(g) further demonstrate by a preponderance of evidence

that there are no conditions which will reasonably assure Suleyman's appearance at court proceedings.[4] First, the nature and seriousness of the charged offenses. The sole charge in the indictment has a ten-year mandatory minimum term of imprisonment and statutory maximum of life imprisonment. Suleyman's tentative Guidelines range is approximately 135 to 168 months, even after acceptance of responsibility. A possible sentence of this length presents the defendant with a strong incentive to flee. Second, the weight of the evidence against Suleyman is strong and there is a reasonable likelihood of conviction. Here, the defendant's own admissions in messages, handwritten letters, and jail calls establish the requisite elements for the charged offense. "It is fair to conclude that [defendant] might have a heightened motivation to flee if the government's evidence is relatively strong." *United States v. Cuong Cau Dang*, No. 13-CR-486-EJD (PSG), 2013 WL 4119426, at *3 (N.D. Cal. Aug. 9, 2013); *see United States v. Walker*, 68 F.4th 1227, 1238 (9th Cir. 2023) (citing weight of evidence to affirm detention order); *United States v. Gebro*, 948 F.2d 1118, 1122 (9th Cir. 1991) (strong evidence of guilt "makes it more likely that he will flee").

**C. The Proposed Release Conditions Are Inadequate**

Pretrial Services has proposed Suleyman's father as a custodian. But courts have found custodians generally inadequate in cases such as Suleyman's. For example, in *United States v. Breeden*, the defendant "point[ed] to the lack of any prior criminal history, the lack of evidence beyond his own statements that he ha[d] ever been involved in similar conduct before, his willingness to be cut off from the internet and access to a computer entirely, his parents' willingness to serve as custodians, the shame that he and his family have already suffered as a result of his arrest and incarceration, and the fact that Pretrial Services would be notified if he left the house." No. 15-MJ-0506 (AK-ABJ), 2015 WL 13310427, at *7 (D.D.C. Nov. 16, 2015) (Berman Jackson, J., reversing release order). Still, the

---

[4] The government acknowledges that the history and characteristics of Suleyman as a § 3142(g) factor generally support release. *Contra United States v. Campas*, No. 24-4024, 2024 WL 1526286, at *2 (10th Cir. Apr. 9, 2024) (per curiam) (detaining defendant who tried to entice an undercover FBI agent even though the defendant had no valid passport and no convictions); *United States v. Pieper*, No. 23-50910, 2024 WL 229266, at *1 (5th Cir. Jan. 22, 2024) (per curiam) (detaining defendant despite "lack of criminal history, United States citizenship, and family ties"); *United States v. Furlow*, No. 20-CR-30050, 2020 WL 6286228, at *5 (C.D. Ill. Oct. 27, 2020) (detaining defendant who messaged undercover agent despite defendant's "remote" and limited criminal history).

*Breeden* court detained the defendant. It doubted that "reliance on the parents—who presumably have to sleep—without any independent monitoring or verification, can supply the necessary assurance that the defendant will not be drawn to the internet during the days and nights when he has absolutely nothing else to do." *Id.*; *see also, e.g., United States v. McIntyre*, No. CR 16-13 (KM), 2018 WL 385034, at *2 (D.N.J. Jan. 10, 2018) (rejecting mother as custodian for defendant who tried to induce a 14-year-old girl to meet with him). Moreover, here, there is evidence that at least one of Suleyman's parents, his mother, has already discussed contacting MV on behalf of the defendant.

## V. CONCLUSION

For the foregoing reasons, there is no set of conditions that will reasonably ensure the safety of the minor victim in this case and the community, or reasonably assure the appearance of Suleyman at court proceedings, if the defendant is released. Accordingly, the Court should order Suleyman detained pending trial.

Dated: November 17, 2024

Respectfully Submitted,

ISMAIL J. RAMSEY
United States Attorney

*/s/ Roland Chang*
ROLAND CHANG
Assistant United States Attorney