CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

JEFF MITCHELL (CABN 236225)
Chief, Criminal Division

ROLAND CHANG (CABN 271511)
Assistant United States Attorney
NEHA NIGAM (ILBN 6327377)
Assistant United States Attorney

450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-6844
Fax: (415) 436-7234
Roland.Chang@usdoj.gov
Neha.Nigam@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>NOAH TAKODA SULEYMAN,<br><br>Defendant. | Case No. 24-cr-476 CRB<br><br>**UNITED STATES' SENTENCING MEMORANDUM**<br><br>Hearing Date: August 26, 2026<br>Hearing Time: 10:00 a.m.<br>Courtroom: 6, 17th Floor<br><br>Hon. Charles R. Breyer |

## I. INTRODUCTION

The defendant Noah Takoda Suleyman ("Mr. Suleyman") is a twenty-nine-year-old man and resident of South Carolina. In late-2023, he started communicating with a minor ("Minor Victim 1"), then a sixteen-year-old minor girl who resided in Northern California. Minor Victim 1 has a significant history of mental health issues and suicidal ideations, which Mr. Suleyman knew about. Mr. Suleyman initially thought Minor Victim 1 was a twenty-four-year-old college student. No later than late February 2024, Mr. Suleyman learned that Minor Victim 1 was indeed a minor. Despite learning this fact, Mr. Suleyman continued sending and soliciting sexually explicit messages from the victim. In mid-March 2024, he drove over 300 miles from his South Carolina residence to have sexual intercourse with Minor Victim 1 while she was visiting North Carolina. On or around May 19, 2024, Mr. Suleyman received eleven child pornography images of Minor Victim 1. Shortly before late-May 2024, Mr. Suleyman drove across the country and removed Minor Victim 1 from her home without her parents' knowledge or consent. Law enforcement started an investigation that eventually found Minor Victim 1 at the home of Mr. Suleyman's mother in South Carolina, and they returned her to her parents' home.

The government appreciates the gravity and seriousness of Mr. Suleyman's conduct, which was shocking, exploitative, and deeply harmful to the victim and her family. At the same time, its recommendation considers the perspective of Minor Victim 1 and her family's wishes for continued healing, recovery, and ultimately closure from this case. For the reasons below, considering the factors set forth in 18 U.S.C. § 3553(a), the government respectfully recommends that the Court sentence Mr. Suleyman to: (i) a term of imprisonment of 60 months; (ii) supervised release for five years, to include a suspicionless search condition and a no-contact order with Minor Victim 1 and her family;[1] (iii) no less than $15,253.88 in restitution; and (iv) a special assessment of $100.

## II. PROCEDURAL HISTORY

On August 21, 2024, a federal grand jury returned a one-count indictment against Mr. Suleyman

[1] The parties agreed to a three-year term of supervised release in the plea agreement. However, the Presentence Investigation Report ("PSR") correctly stated that the law requires a five-year minimum term of supervised release. PSR at 26. The government has conferred with defense counsel; both parties intend to recommend the minimum five-year supervised release term in their respective sentencing memoranda.

for coercion and enticement of a minor, in violation of 18 U.S.C. § 2422(b). Dkt. 1. On May 21, 2026, the United States filed a two-count superseding information with one additional count for receipt of child pornography, in violation of 18 U.S.C. §§ 2252(a)(2) and (b)(1). Dkt. 75. On June 17, 2026, Mr. Suleyman pled guilty to one count of receipt of child pornography via a plea agreement pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C). *See* Dkts. 82-83. In the plea agreement, the parties jointly agreed to a sentence of five years' imprisonment, restitution of at least $3,000, and a fine and special assessment as imposed by the Court. Dkt. 82 ¶ 8. The government also agreed to move to dismiss any open charges pending against Mr. Suleyman at the time of sentencing. *Id.* ¶ 16.

## III. OFFENSE CONDUCT[2]

Beginning on or around November 2023, Mr. Suleyman started communicating with Minor Victim 1 using an online social platform called Discord. PSR ¶ 8. At the time, Mr. Suleyman was twenty-six years old and Minor Victim 1 was fifteen years old. *Id*. "Initial messages established that Mr. Suleyman believed that Minor Victim 1 was a 24-year-old college student." *Id.* The two of them exchanged a significant number of messages for several months, including many that discussed Minor Victim 1's mental health issues. *Id.* ¶¶ 8, 9. During these conversations, Mr. Suleyman repeatedly initiated discussions on sexually explicit topics. *See id.* ¶ 10.

"No later than late February 2024, Mr. Suleyman learned that Minor Victim 1 was 16 years old, i.e., a minor under the age of 18." PSR ¶ 11. Learning about Minor Victim 1's age did not deter Mr. Suleyman. "He [] continued sending sexually explicit and suggestive messages." *Id.* In mid-March 2024, Mr. Suleyman drove approximately 300 miles from his home in South Carolina to meet Minor Victim 1 in person, while she was visiting North Carolina during her high school spring break. PSR ¶ 12. In North Carolina, Mr. Suleyman and Minor Victim 1 had sexual intercourse multiple times. *Id.* ¶¶ 13-15.

After Minor Victim 1 returned to California, Mr. Suleyman continued messaging her with sexually explicit messages. *Id*. ¶ 16. Mr. Suleyman also discussed Minor Victim 1's mental health and

[2] To protect the confidentiality and privacy of the victim and her family, the government is not including excerpts of the sexually explicit communications between Mr. Suleyman and the victim, which are stated in greater detail in the PSR.

living situation. *Id.* ¶ 17. In addition, Mr. Suleyman started planning with Minor Victim 1 "for her to run away to be with him, and he discussed how they would avoid getting caught." *Id.* ¶ 18. Mr. Suleyman also made plans to get a vasectomy, which apparently occurred, to engage in further sexual intercourse with Minor Victim 1. *Id.* ¶ 19.

On or about May 19, 2024, well after Mr. Suleyman knew Minor Victim 1 was sixteen years old, Mr. Suleyman received eleven sexually explicit images of Minor Victim 1. *Id.* ¶ 7. "The screenshot images were taken by Mr. Suleyman during the videoconference call with Minor Victim 1." *Id.* "When Mr. Suleyman received these images, he knew they contained visual depictions of a minor engaged in sexually explicit conduct, and that production of these visual depictions involved the use of a minor engaged in sexually explicit conduct." *Id.* Mr. Suleyman knowingly possessed these visual depictions on his Samsung Galaxy cellular phone." *Id.*

Shortly before Memorial Day 2024, Mr. Suleyman drove from South Carolina to California, where he removed Minor Victim 1 from her family's residence and transported her back to South Carolina. PSR ¶ 20. Minor Victim 1's mother reported her child as missing to the Santa Rosa Police Department. *Id*. Minor Victim 1's mother also located a handwritten note from Minor Victim 1 that stated her desire to run away, "and that if Minor Victim 1 had stayed in the home, she would not be alive." *Id.*

Multiple law enforcement agencies, including the FBI, became involved in the search for Minor Victim 1. *Id.* ¶ 21. Law enforcement eventually determined that Mr. Suleyman had communicated with Minor Victim 1 for months—and had returned to South Carolina after a trip to California, leading them to interview him. *Id*. ¶¶ 21, 22. FBI first interviewed Mr. Suleyman on May 29, 2024. *Id.* ¶ 22. At that interview, Mr. Suleyman lied about "not knowing Minor Victim 1's whereabouts, believing her age to be 24, and his own whereabouts the prior weekend." *Id.* During his second interview with the FBI, Mr. Suleyman ultimately admitted that Minor Victim 1 was at his mother's residence. *Id.* Shortly thereafter, law enforcement successfully recovered Minor Victim 1 unharmed. *Id.* "Mr. Suleyman was arrested and charged in South Carolina with contributing to the delinquency of a minor and obstruction of justice." *Id.*

***Post-Arrest Conduct.*** After his arrest in South Carolina, Mr. Suleyman tried to contact Minor

Victim 1, primarily through his mother. PSR ¶ 23. Separately, Mr. Suleyman wrote a five-page handwritten letter to Minor Victim 1's family in which he explained his actions. *Id.* ¶ 24. Finally, "on June 21, 2024, Mr. Suleyman wrote an eight-page handwritten letter addressed to a judge of the 13th Judicial Circuit Court in South Carolina, who was originally going to preside over the defendant's initial bond hearing in state court." *Id.* ¶ 25. In the letter, "Mr. Suleyman admitted to knowledge of Minor Victim 1's minor age and status but again stated that his actions were all motivated by his intent to protect Minor Victim 1 and save her life." *Id.*

***Mr. Suleyman's Attempts to Conceal His Conduct.*** As summarized in the PSR, "Mr. Suleyman made multiple attempts to conceal his actions from law enforcement." PSR ¶¶ 26-29. That included taking steps to minimize potential tracking of his cross-country trip between South Carolina and California and deleting the primary Discord account that he used to communicate with Minor Victim 1. *See id.*

## IV. SENTENCING GUIDELINES CALCULATION

The government agrees with Probation's offense-level calculation in the PSR, which is identical to the Guidelines calculation in the plea agreement. PSR ¶¶ 36-48.

**Count 1: Receipt of Child Pornography**

| **Description** | **U.S.S.G. Section(s)** | **Points** |
|---|---|---|
| Base Offense Level | § 2G2.2(a)(2) | 22 |
| Specific Offense Characteristics: | | |
| - Pattern of activity involving sexual abuse or exploitation of a minor | § 2G2.2(b)(5) | +5 |
| - Use of a computer | § 2G2.2(b)(6) | +2 |
| - At least 10 images, but less than 150 images | § 2G2.2(b)(7)(A) | +2 |
| Acceptance of Responsibility | §§ 3E1.1(a) and (b) | -3 |
| **Total Offense Level** | | **28** |

The government's Guidelines calculation for Count One results in a Total Offense Level of 28. The government agrees with Probation that Mr. Suleyman's Criminal History Category is I. PSR ¶¶ 49-

52. Total Offense Level of 28 at CHC I yields a Guidelines range of 78 months to 97 months of imprisonment. Receipt of child pornography convictions require a sentence of imprisonment of "not less than 5 years." 18 U.S.C. § 2252(b)(2).

## V. SENTENCING RECOMMENDATION

### A. Legal Standard

The United States Sentencing Guidelines serve as "the starting point and the initial benchmark" of any sentencing process and are to be kept in mind throughout the process. *See United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008); *see also United States v. Kimbrough*, 522 U.S. 85, 108 (2007). The overarching goal of sentencing, as set forth by Congress, is for the Court to "impose a sentence sufficient, but not greater than necessary." *Carty*, 520 F.3d at 991 (citation omitted). In accomplishing that goal, the Court should consider the factors set forth under 18 U.S.C. § 3553(a), which include:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(3) the need for the sentence imposed to afford adequate deterrence to criminal conduct;

(4) the need for the sentence imposed to protect the public from further crimes of the defendant;

(5) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(6) the need to provide restitution to any victims of the offense.

### B. Probation's Recommendation

Probation has recommended that the Court sentence Mr. Suleyman to a term of imprisonment of 78 months. PSR at 26. Probation has also recommended a fifteen-year term of supervised release. *Id.* Finally, Probation has recommended restitution in the amount of $15,253.88 and a special assessment of $100. *Id.*

//

//

**C. Government's Sentencing Recommendation**

The Supreme Court has long recognized that the prevention of sexual exploitation and abuse of children is a "government objective of surpassing importance." *New York v. Ferber*, 458 U.S. 747, 756 (1982). The government's sentencing recommendation reflects, first and foremost, the "surpassing importance" of its solemn obligation and prerogative to disrupt, dismantle, and deter all persons who sexually exploit and abuse children.

Recognizing the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence, and considering the defendant's history and characteristics, the government recommends that the Court sentence Mr. Suleyman to: (i) a term of imprisonment of 60 months; (ii) supervised release for five years, to include a suspicionless search condition and a no-contact order with Minor Victim 1 and her family; (iii) no less than $15,253.88 in restitution; and (iv) a special assessment of $100.

***Nature and Circumstances of Offense.*** Receipt of child pornography victimizes one of society's most vulnerable populations. It is a serious offense, reflected in the imposition of a mandatory minimum of five years' imprisonment for convictions. As Probation recognized in the PSR, this was not a typical receipt of child pornography case that involved no direct contact with minors. *See* PSR at 27. Instead, Mr. Suleyman befriended Minor Victim 1, whom he initially believed to a twenty-four-year-old adult female, online. That was not a crime. However, when Mr. Suleyman learned Minor Victim 1's true minor age several months later, he should have immediately ceased sending and soliciting sexually explicit messages from the victim. He did not. Instead, those messages continued, often consistently and repeatedly. Subsequently, Mr. Suleyman traveled across state lines to have sexual intercourse with Minor Victim 1 in North Carolina. In mid-May, Mr. Suleyman's criminal conduct included the receipt of sexually explicit images of Minor Victim 1. While the government acknowledges that some of the messages sent by Mr. Suleyman suggested a non-prurient interest in Minor Victim 1, that did not excuse Mr. Suleyman's sexually exploitative conduct in this case.

Eventually, Mr. Suleyman drove across the country to remove Minor Victim 1 from her family's residence in the San Francisco Bay Area to his home in South Carolina. This triggered a bi-coastal law enforcement investigation that resulted in the successful recovery of the victim, unharmed. Mr.

Suleyman attempted to conceal his actions from law enforcement, both before and during the investigation to recover Minor Victim 1. Upon his arrest, Mr. Suleyman continued to attempt to contact Minor Victim 1 and her family— and sought to justify his actions, including in multiple handwritten letters. In short, the nature and circumstances of Mr. Suleyman's actions were serious, consistent, and worthy of punishment. *See* 18 U.S.C. § 3553(a).

***Defendant's History and Characteristics.*** While Mr. Suleyman's conduct was reprehensible, the government acknowledges he has mitigating circumstances in his personal history. First, he has no prior criminal convictions. Second, it appears that Mr. Suleyman has not targeted or victimized other minors. Third, Mr. Suleyman had a difficult childhood during which he personally experienced sexual abuse at a very young age.

***Victim Impact.*** Separately, the government has submitted victim impact statements from Minor Victim 1's parents that detail the devastating, severe, and life-altering impact of Mr. Suleyman's conduct. *See* PSR ¶¶ 31-33. Out of respect for the privacy of the family, the government will not repeat the specific statements contained therein. Minor Victim 1 and her family support the plea agreement and the government's proposed sentence in this case. The government's recommendation considers the perspective of the victims, as well as the need to provide just punishment for the offense, and to protect the public from further crimes by the defendant. Specifically, here, given the significant mental health challenges and life lasting consequences that resulted from Mr. Suleyman's criminal actions, the government's recommendation seeks to balance the need for a just sentence with a genuine desire from Minor Victim 1 and her family to avoid additional trauma and to obtain closure from this chapter in their lives.

***Unwarranted Sentencing Disparities.*** Finally, a five-year term of imprisonment will avoid unwanted sentencing disparities. During the last five fiscal years (FY2021-2025), "there were 810 defendants whose primary guideline was §2G2.2, with a Final Offense Level of 28 and a Criminal History Category of I." PSR ¶ 100. "For the 798 defendants (99%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 56 month(s) and the median length of imprisonment imposed was 60 month(s)." *Id.*

//

**D. The Government Seeks Restitution in the Amount of $15,253.88**

Restitution is mandatory to victims of child pornography pursuant to 18 U.S.C. §§ 2259 (sexual exploitation of children offenses §§ 2251-2258) and 18 U.S.C. §§ 3663A (MVRA). *See* PSR ¶¶ 90-94. The law requires that the Court shall determine the full amount of the victim's losses incurred and/or are reasonably projected to be incurred by the victim as a result of the defendant's crime, and then "order restitution in an amount that reflects the defendant's relative role in the causal process that underlies the victim's losses, but which is no less than $3,000." 18 U.S.C. § 2259(b)(2); *see also Paroline v. United States*, 572 U.S. 434,457-62. Restitution in child pornography cases serves "twin goals of helping the victim achieve eventual restitution for all her child-pornography losses and impressing upon offenders the fact that child-pornography crimes, even simple possession, affect real victims." *Paroline*, 572 U.S. at 457. In short, § 2259 "is phrased in generous terms, in order to compensate the victims of sexual abuse for the care required to address the long term effects of their abuse." *United States v. Laney*, 189 F.3d 954, 966 (9th Cir. 1999). To the extent there is a dispute about the correct amount of restitution, it is the government's burden to demonstrate the amount of the loss to the victim by a preponderance of the evidence. *See United States v. Waknine*, 543 F.3d 546, 556 (9th Cir. 2008) (citing 18 U.S.C. § 3664(e)).

The United States has received a restitution request from Minor Victim 1's family for payments associated with "mental health treatment, medical expenses, and travel expenses associated with the offense." PSR ¶ 93. Thus, the government respectfully requests that the Court order Mr. Suleyman to pay restitution in the total amount of $15,253.88, according to the payment plan provided in the PSR. *See* PSR at 34.[3] While restitution will not erase the trauma that Minor Victim 1 and her family experienced, this money can help financially with the resources they needed to begin the healing process.

**E. The Court Should Impose a Suspicionless Search Condition**

Finally, given the seriousness of Mr. Suleyman's conduct, the Court should order a suspicionless

[3] The government and defense counsel are currently engaged in a meet-and-confer process on the total restitution amount, which may obviate the need for further litigation on this issue. The government reserves their right to seek a restitution hearing should they be unable to reach an agreement with defense counsel.

search condition upon the defendant's release. Specifically, the government requests the following condition of supervised release, which the parties agreed to in the plea agreement. *See* Dkt. 82 at 13.

> [The defendant] shall submit [his] person, residence, office, vehicle, electronic devices and their data (including cell phones, computers, and electronic storage media), and any property under [defendant's] control to a search by a United States Probation Officer or any federal, state, or local law enforcement officer at any time, with or without suspicion. Failure to submit to such a search may be grounds for revocation; the defendant shall warn any residents that the premises may be subject to searches.

It is "well-established" that "conditional releasees are not entitled to the full panoply of rights and protections possessed by the general public" and in fact "enjoy severely constricted expectations of privacy relative to the general citizenry." *United States v. Kincade*, 379 F.3d 813, 833–34 (9th Cir. 2004) (en banc) (citing Supreme Court cases); *see also United States v. Kriesel*, 508 F.3d 941, 950 (9th Cir. 2007) (noting that those on supervised release have "diminished privacy interests").

Indeed, "those who have suffered a lawful conviction" are properly subject to a "broad range of [restrictions] that might infringe constitutional rights in a free society." *McKune v. Lile*, 536 U.S. 24, 36 (2002). For that reason, courts regularly uphold supervised release conditions that permit searches without a warrant and without reasonable suspicion. *See, e.g., Samson v. California*, 547 U.S. 843, 855–57 (2006) (analogizing state parole to federal supervised release and holding that "the Fourth Amendment does not prohibit a police officer from conducting a suspicionless search of a parolee"); *United States v. Cervantes*, 859 F.3d 1175, 1184 (9th Cir. 2017), as amended on denial of reh'g and reh'g en banc (Sept. 12, 2017) (approving "warrantless, suspicionless search condition[]" imposed on supervised release); *United States v. Betts*, 511 F.3d 872, 876 (9th Cir. 2007) (noting "[t]here is no sound reason for distinguishing parole from supervised release with respect to [suspicionless search conditions]").

District courts are well within their discretion to impose suspicionless search conditions in appropriate circumstances. *See Betts*, 511 F.3d at 876 ("[a]fter *Samson*, there is no room for treating the search condition in this case as an abuse of discretion."). "A district court enjoys 'significant discretion' in determining the conditions of supervised release for criminal defendants, including the authority to impose restrictions that infringe on fundamental rights." *United States v. Gibson*, No. 4:14-CR-00217-JD-1, 2016 WL 6873466, at *1 (N.D. Cal. Nov. 22, 2016) (citing *United States v. Weber*, 451 F.3d 552,

557 (9th Cir. 2006)). Based on the seriousness of Mr. Suleyman's conduct and to protect the community, the Court should impose a suspicionless search condition.

## VI. CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court sentence Mr. Suleyman to: (i) a term of imprisonment of 60 months; (ii) supervised release for five years, to include a suspicionless search condition and a no-contact order with Minor Victim 1 and her family; (iii) no less than $15,253.88 in restitution; and (iv) a special assessment of $100. We hope that our prosecution has provided some measure of justice and closure for Minor Victim 1, her family, and the community.

DATED: August 19, 2026

Respectfully submitted

CRAIG H. MISSAKIAN
United States Attorney

*<u>/s/ Roland Chang</u>*
ROLAND CHANG
NEHA NIGAM
Assistant United States Attorneys